UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| NONPAREIL CORPORATION and IDAHO POTATO PACKERS CORPORATION, | Case No. 4:10-cv-00500-EJL |
| Plaintiffs, | **MEMORANDUM DECISION AND ORDER** |
| v. | |
| HARTFORD CASUALTY INSURANCE COMPANY, | |
| Defendant. | |

**INTRODUCTION**

Pending before the Court in the above-entitled matter is Defendant's Motion for Summary Judgment. (Dkt. 46, 24.) Having fully reviewed the record, the Court finds that the facts and legal arguments are adequately presented in the briefs and record. Accordingly, in the interest of avoiding further delay, and because the Court conclusively finds that the decisional process would not be significantly aided by oral argument, these motions shall be decided on the record before this Court without oral argument

Defendant, Hartford Casualty Insurance Company ("Hartford") moves for summary judgment pursuant to Federal Rule of Civil Procedure 56 in its civil case against Plaintiffs Nonpareil Corporation and Idaho Potato Packers Corporation (collectively, "Nonpareil"). The disputed issue between the parties is whether the "Dry Rot" provision in Nonpareil's insurance policy with Hartford covered potatoes which Nonpareil argues rotted due to equipment failure. Hartford argues that Nonpareil is not entitled to any further coverage because the policy limit for rotten potatoes is already paid in full, because Nonpareil cannot show it incurred expenses during the Period of Restoration covered by the insurance policy, and because the losses are not covered by any other provision in the policy.

## STIPULATION OF THE PARTIES

On September 17, 2012, the parties filed a Stipulation Re: Summary Judgment, which includes the following agreements between the parties:

1.     The parties have partially resolved their dispute, and have agreed to submit a single remaining issue to the Court for determination via summary judgment; to wit, the sole claim related to plaintiffs' "Dry Rot" claim under the insurance policy at issue.

2.     The parties stipulate that such claim encompasses only the following claims as set forth in Mr. Pilgrim's expert report of December 9, 2011 (p. 12 and referenced exhibits):  1) $39,414 for raw potato sold at a loss; 2) $52,926 for dry decay split with grower, and 3) $456,047 for dry rot ending inventory.

3.     The parties stipulate to the amounts set forth in 2 above.

4.      The parties stipulate that Hartford has paid the full $50,000 in Policy Limits under the "Fungus", Wet Rot, Dry Rot, Bacteria and Virus coverage in the Policy.

5.      The parties stipulate that in light of 3 and 4, if plaintiffs prevail in whole or in part, plaintiffs' judgment cannot exceed $498,387.

6.      The parties stipulate that, if plaintiffs prevail in whole or in part, plaintiffs cannot recover any amounts for prejudgment interest, attorneys' fees, or costs.

7.      The parties stipulate that the potatoes at issue, as identified in 2 above, rotted.

8.      The parties stipulate that the summary judgment standard the Court will use will be that of the court sitting as trier of fact, allowing inference as to facts. *E.g.*, *In re Silver State Helicopters, LLC*, 403 B.R. 849, 853 (Bankr. D. Nev. 2009) ("When the judge is also ultimate trier of fact, and when trial would not enhance the bankruptcy court's ability to draw such inferences and conclusions from undisputed facts, then the court is free to draw such inferences and conclusions within the context of a motion for summary judgment.").

(Dkt. 46).

## BACKGROUND/FACTS

Nonpareil is a business located in Blackfoot, Idaho that engages in the sale of processed and unprocessed potatoes. Nonpareil is insured under a policy issued by Hartford, Policy No. 34 UUNFZ5964. On March 2, 2008, one of the boilers at Nonpareil's plant broke down. The replacement boiler was up and running on April 22, 2008. Hartford paid Nonpareil $579,148.89 in Property Damage payments to replace the damaged boiler. Hartford paid an additional $375,158 in Extra Expenses incurred by Nonpareil to purchase finished flake to fulfill customers' orders related to the shutdown and to cover the policy limit of $50,000 for dry rot. Nonpareil claims that it is entitled to an additional $39,414 in raw potato sold at a loss, $52,926 for dry-decay split with growers, and $456,047 for dry rot ending inventory (less the $50,000 already paid for dry rot). The key provisions of the policy at issue are "Business Interruption" coverage (form PC 00 21 01 03), "Extra Expense" coverage (form PC 0024 01 03), "Future Earnings" coverage (form PC 00 21 01 03), and "Fungus, Wet Rot, Dry Rot, Bacteria, and Virus" coverage (form PC 00 10 01 03, Section 4.0).

**1. <u>Nonpareil's Analysis of Claimed Losses</u>**

A. <u>$39,414 for Raw Potatoes Sold at a Loss</u>

Nonpareil had a contract with DC Farms to purchase 1,390,556 pounds at $5.50 per hundred weight. When Nonpareil knew it could not process these potatoes due to the boiler failure, it sold them for $3.75 per hundred weight. Nonpareil also had a contract to purchase 343,909 pounds of potatoes from DC Farms at $5.50 per hundred weight. When

Nonpareil knew it could not process these potatoes due to the boiler failure, N o n p a r e i l sold them to a competitor for $3.75 per hundred weight. Nonpareil had a third contract to purchase 1,208,171 pounds of potatoes from Hansen Brothers at $5.25 per hundred weight. When Nonpareil knew it could not process these potatoes due to the boiler failure, it sold them for $4.50 per hundred weight. (Dkt 55, pp. 8-9).

Nonpareil argues this claim consists of the cost incurred in the normal course of its business for potatoes, and thus should be considered Business Income loss within the Business Interruption calculation. (Dkt. 54, p. 9).

### B. $52,926 for Split of Loss on Purchase Contracts

Nonpareil had contracted to purchase potatoes from two growers, KR Farms and Hansen Brothers. These potatoes were being held in facilities owned by the growers. When Nonpareil knew it could not take delivery of these potatoes due to the boiler failure, it entered into a settlement agreement with KR Farms and Hansen Brothers to buy out of these contracts by splitting the potential loss with the growers. Nonpareil paid $43,150.00 to KR Farms and $9,769.00 to Hansen Brothers. Nonpareil argues the "Extra Expenses" portion of the policy covers this claim because it had to buyout these contracts to minimize its losses. (Dkt. 55, p. 9). Nonpareil contends that such losses exceed normal operating expenses. (Dkt. 54, p. 7).

### C. $456,047 for Dry Rot Loss in Ending Inventory

Nonpareil had acquired raw potatoes and stored them in twelve potato cellars at various locations to be used during the production period to produce potato flake. (Dkt.

55, p. 9).  These potatoes could not be processed due to the boiler failure and eventually rotted.1 Nonpareil claims losses of $456,047 from the boiler failure. It asserts it is not appropriate to categorize this loss under the "Fungus, wet rot, dry rot, bacteria and virus" clause of the policy. Rather, Nonpareil asserts the $456,047 figure is the cost it incurred in their usual and customary course of business in procuring potatoes for flake production and the seven weeks of no production resulted in Nonpareil being unable to timely process the potatoes it held in inventory.  As such, it argues this is a Business Income loss covered by the "Business Interruption" portion of the policy because the boiler failure stopped its normal business process. (Dkt. 54, p. 8). Nonpareil maintains it incurred this expense during the Period of Restoration 2 (March 3, 2008 - April 28, 2008) due to "direct physical damage…or loss" after the boiler failure. (Dkt. 55, p. 10).

Because Nonpareil views the $39,414 for potatoes sold at loss claim and the $456,047 ending inventory claim to fall within the Business Interruption coverage, it argues that it is entitled to be reimbursed under the "Future Earnings" provision within the Business Interruption coverage. The policy covers Business Income losses up to two years from the date the loss occurred:

> 1)      In event of a covered business loss, we will pay for the actual reduction in Business Income you subsequently and necessarily sustain after the Period of Restoration and the Extended Income

---

1 Potatoes in cellars: 3, 8, 9, 10, 11, 14, 15, 20, 24, 25, 27 and 29.
2 "Period of Restoration…(a) [b]egins at the time the Covered Cause of Loss occurred; and (b) Ends on the earlier of (i) The date when the property should be repaired, rebuilt or replaced with reasonable speed and similar quality; or (ii) The date when business is resumed at a new permanent location." (Dkt 44, 6; citing form PC 00 21 01 03, Business Income Coverage Form A(1)(c)(1)).

> Period that is directly attributable to the Covered Cause of Loss occurrence
>
> \*\*\*
>
> 2) This coverage will apply to the actual reduced business income you sustain within 2 years from date of the Covered Loss occurred.

(form PC 00 24 01 03 § A(2)(h)(3)).

### D. Ambiguity

Nonpareil argues that the terms of the policy unambiguously permit it to recover under the Business Interruption and Extra Expenses portions of the policy. In the alternative, Nonpareil argues that if the Court finds the terms do not unambiguously grant it a right to recovery, then a latent ambiguity exists in this contract because applying the various provisions to the facts and understanding how they interact becomes unclear. Nonpareil argues that if a latent ambiguity exists, the disputed issues must be resolved in its favor.

## 2. Hartford's Analysis of Claimed Losses

### A. All Claims Should be Denied as Nonpareil Cannot Tie Any of the Three Claims to the Relevant Period of Restoration

Hartford already paid out the policy maximum $50,000 coverage amount under "Fungus," Wet Rot, Dry Rot, Bacteria and Virus provision and argues that the additional losses claimed are not covered by the Business Interruption or the Extra Expense portions of the policy. (Dkt. 48-1). Hartford maintains dry rot damages are limited to the Period of

Restoration which was from March 3, 2008 (the boiler shut down) to April 22, 2008 (when replacement boiler was up and running) and any extra expenses not paid during the Period of Restoration are not recoverable.

B. $39, 414 for Raw Potatoes Sold at Loss

Nonpareil sold these potatoes at a loss to DC Farms and Hansen Brothers between June 16, 2008 and July 10, 2008. Hartford argues that Nonpareil cannot recover this claimed loss because these sales were made almost two months after the end of the Period of Restoration.

C. $52,926 for Split of Loss on Purchase Contracts

While Nonpareil claims this amount as "Extra Expense" incurred from the boiler breakdown, Hartford claims that the Extra Expense provision will only apply to necessary and reasonable expenses due to interruption of the business operations during the Period of Restoration. Hartford argues that this loss falls outside the application Period of Restoration because the payments to the growers to split the loss were made between May 19, 2008 and September 2008. Consequently, Nonpareil cannot recover under the Extra Expenses provision of the policy.

D. $456,047 for Dry Rot Loss in Ending Inventory

Hartford argues that Nonpareil's claim for this loss fails as a matter of law because Nonpareil, as the insured, failed to meet its burden to show its losses are covered under the policy, evidenced by the fact that Nonpareil's Director of Procurement, Stephen Abend, could not identify if the rot occurred before or after the boiler broke. (Dkt. 48-1,

p. 11).3 Hartford cites *Buckley v. Orem*, 730 P.2d 1037, 1042 (Idaho Ct. App. 1986), where the court held "the burden is upon the insurer to show the limits of its liability, and the burden is on the insured to demonstrate that a loss is encompassed by the general coverage provisions of the insurance contract." Consequently, because the cause of the dry rot cannot definitively be attributed to boiler failure, there is no proof that this loss occurred within the Period of Restoration. Hartford argues per *Buckley*, Nonpareil cannot recover these losses under the policy.

### E. Policy's "Future Earnings" Provision is Inapplicable

Hartford argues that triggering the "Future Earnings" provision requires the insured to suffer a "covered Business Income loss." Hartford points out that immediately after the boiler failure, Nonpareil purchased 4,776,700 pounds of finished flake from other suppliers to fulfill existing orders. Nonpareil then made a claim for that purchase and Hartford paid it. Because of this purchase of flake by Nonpareil, Hartford argues that no flake purchase contracts went unfulfilled by Nonpareil after the boiler failure. Hartford also argues overall production exceeded prior years so no Business Income loss was actually sustained. Thus, there should be no recovery Business Income loss.

### 3. **Contract Terms**

For the purposes of this motion, the relevant portions of the policy are as follows:

**(A)**

---

3 When asked during his deposition if he knew when the potatoes began to rot, he said, "I'm not exactly sure." (Depo. of Stephen Abend, Ex. L to Nickles Aff., Dkt. 44-44, p. 23, 68:4 - 9). Later on in his deposition, the Director of Procurement was asked if he knew the "hot spot" had been identified in the storage cellar, he replied, "Yes. I absolutely know that we knew the hot spot was there prior to the boiler going down." (*Id.*, at p. 28, 86:10-25). Mr. Abend also testified he hoped to utilize or process the stored potatoes with the hot spot into flake. (*Id.*).

**PROPERTY CHOICE - BUSINESS INCOME**
**COVERAGE FORM**
**(BUSINESS INTERRUPTION)**

## A. COVERAGE

We will pay up to the Business Income limit of Insurance stated in the Property Choice Declarations for the actual loss of Business Income you sustain due to the necessary interruption of your business operations during the Period of Restoration due to direct physical loss of or direct physical damage caused by or resulting from Covered Cause of Loss to property at "Scheduled Premises". If you are a tenant, this Coverage applies to that portion of the building which you rent, lease or occupy, and extends to common service areas and access routes to your area.

### 1. Definitions

    **a.** Business Income means the:

        **(1)** Net Income (Net Profit or Net Loss before income taxes), including Rental Income, that would have been earned or incurred; and

        **(2)** Continuing normal operation expenses incurred, including payroll.

      \*\*\*

        **(4)** For manufacturing businesses, Net Income also includes the net sales value of production.

      \*\*\*

        **(6)** As respects all insureds if you are operating at a Net Loss, continuing normal operating expenses will be offset by the Net Loss.

    **b.** Interruption means the slowdown or cessation of any part of your business activities or the partial or total untenantability of the premises.

    **c. (1)** Period of Restoration means the period of time that:

        **(a)** Begins at the time the Covered Cause of Loss occurred; and

        **(b)** Ends on the earlier of:

            **(i)** The date when the property should be repaired, rebuild or replaced with reasonable speed and similar quality; or

            **(ii)** The date when the business is resumed at a new permanent location.

The expiration date of this policy will not cut short the
Period of Restoration.

This portion of the policy (Form PC 00 21 01 03, page 1 of 10) is often referred
to in the motion papers as " Business Income." *See* Ex. 1, HSB 8913-8922.

∗∗∗

**(B)**

**PROPERTY CHOICE- EXTRA
EXPENSE COVERAGE FORM
(BUSINESS INTERRUPTION)**

## A. COVERAGE

We will pay up to the Extra Expense Limit of Insurance stated in the Property Choice
Declarations for the necessary and reasonable Extra Expense you incur due to the
necessary interruption of your business operations during the Period of Restoration due
to direct physical loss of or direct physical damage caused by or resulting from a
Covered Cause of Loss to property at "Scheduled Premises." If you are a tenant, this
Coverage applies to that portion of the building which you rent, lease or occupy, and
extends to common service areas and access routs to your area.

### 1. Definitions

**a**. Extra Expense means the necessary, reasonable and additional expenses you
incur during the Period of Restoration that exceed the normal expenses that you
would have incurred if there had been no direct physical loss or no direct physical
damage to property at "Scheduled Premises" caused by or resulting from a Covered
Cause of Loss.

Coverage pertains to expenses (other than the expense to repair or replace
property) which are incurred to:

**(1)** Avoid or minimize the interruption of business and to continue business
operations at the insured premises or at replacement premises or at temporary
locations, including relocation expenses and costs to equip and operate the
replacement location or temporary location.

**(2)** Minimize the interruption of business if you cannot    continue operating.

**( 3 )** Extra Expense Coverage does not apply to:

**( a )** Any deficiencies in insuring real or personal property; or

**(b)** Any expenses related to any recall of products  you
manufacture, handle or distribute.

We will also pay Extra Expenses to repair or replace property, but only to the extent it reduces the amount of loss that otherwise would have been payable under this Coverage Form.

**b.** Interruption means the slowdown or cessation of any part of your business activities or the partial or total untenantability of the premises.

**c.** **(1)** Period of Restoration means the period of time that:

   **(a)** Begins at the time the Covered Cause of Loss occurred; and

   **(b)** Ends on the earlier of:

      **(i)** The date when the property should be repaired, rebuilt or replaced with reasonable speed and similar quality; or

      **(ii)** The date when business 1s resumed at a new permanent location.

This portion of the policy (Form PC 00 24 01 03, page 1 of 7)(Ex. I, HSB 8923-8929) is often referred to in the Motion papers as "Extra Expense Coverage" or "Extra Expense Business Interruption."

\*\*\*
**(C)**

**d.** **"Fungus," Wet Rot, Dry Rot, Bacteria and Virus - Limited Coverage**

   **(1)** The coverage described in **d**. **(2)** below only applies when the "fungus", wet rot, dry rot, bacteria or virus is the result of one or more of the following causes that occurs during the policy period and only if all reasonable mans were used to save and preserve the property from further damage at the time of and after that occurrence:

      **(a)** A "specified cause of loss" other than fire or lightening;

      **(b)** Equipment breakdown accident occurs to Equipment Breakdown Property, if Equipment Breakdown applies to the effected premises; or

      **(c)** Flood, if the Causes of Loss - Flood endorsement applies to the affected premises.

   **(2)** The following **(2)(a)** or **(2)(b)** applies only if Extra Expense coverage applies to the "Scheduled Premises" and only if the necessary interruption

of your business operations satisfies all terms and conditions of this coverage form.

> **(a)** If the loss which results in "fungus," wet rot, dry rot, bacteria or virus does not in itself necessitate a necessary interruption of your business operations, but such interruption is necessary due to loss or damage to property caused by "fungus," wet rot, dry rot, bacteria or virus, then our payment under Extra Expense is limited to the amount of the expense sustained in a period of not more than 30 days. The days need not be consecutive.

> **(b)** If a covered necessary interruption of your business operations was caused by loss or damage other than "fungus," wet rot, dry rot, bacteria or virus prolongs the Period of Restoration, we will pay for expense sustained during the delay (regardless of when such delay occurs during the period of restoration), but such coverage is limited to 30 days in total. The days need not be consecutive.

> **(c)** This Additional Coverage is included within the Extra Expense Limit of Insurance.

This portion of the policy (Form PC 00 24 01 03, page 4 of 7) is often referred to in the motion papers as "Fungus Limitation." ( Ex 1 HSB 8926).

***
(D)

## c. Spoilage

> We will pay for your loss of perishable goods due to:

> **(1)** Spoilage; or

> **(2)** Contamination caused by the release of refrigerants, including but not limited to ammonia; caused by or resulting from an Equipment Breakdown Accident to Equipment Breakdown Property located at the premises.

We will not pay for loss or damage as a result of your failure to use all reasonable means to protect the perishable goods from damage following and Equipment Breakdown Accident.

We will also pay any necessary expenses you incur to reduce the amount of loss under this coverage. We will pay for such expenses to the extent that they

do not exceed the amount of loss that otherwise would have been payable under this coverage.

If you are unable to replace perishable goods before its anticipated sale, the amount of our payment will be determined on the basis of the sales price of the perishable goods at the time of the Equipment Breakdown Accident, less discounts and expenses you otherwise would have had. Otherwise our payment will be determined in accordance with the Valuation condition.

As used in this Additional Coverage, perishable goods means personal property maintained under controlled conditions for its preservation, and susceptible to loss or damage if the controlled conditions change.

The most we will pay for each occurrence of covered loss or damage under this Coverage Extension is the Spoilage Limit of Insurance stated in the Declarations.

This is included within the Covered Property Limit.

This portion of the policy (Form PC 10 10 01 03, page 7 of 7)(Ex. 1 HSB

8939) is often referred to in the motion papers as the "Spoilage- Exclusions."

The policy further provides coverage for business income lost within two

years of a covered loss in the section entitled "Future Earnings." The "Future

Earnings" portion of the Business Interruption policy form is contained in the

policy (Counsel Aff. Ex. A, Depo Ex. 37 at HSB 8918).

Such "Future Earnings" provision of the policy provides:

 **(h) Future Earnings**

  **1)** In the event of covered Business Income loss, we will pay for the actual reduction in Business Income you subsequently and necessarily sustain after the Period of Restoration and the Extended Income period ends and that reduction in Business Income is directly attributable to the Covered Cause of Loss occurrence.

  ***

**3)** This coverage will apply to the actual reduced business income you sustain within 2 years from the date the Covered Cause of Loss occurred.

The policy also provides that expenses incurred to reduce losses are a covered loss of Business Income.

**(e) Expenses to Reduce Loss**

In the event of a covered loss of Business Income, we will pay necessary expenses you incur, except the cost of extinguishing a fie, to avoid further loss of **Business Income**. The total of our repayment for **Business Income** loss and Expense to Reduce Loss will not be more than the Business Income loss that would have been payable under this Coverage Form if the Expense to Reduce Loss had not been incurred. This coverage does not increase the Limit of Insurance.

# ANALYSIS

1. <u>**Standard of Review**</u>

Motions for summary judgment are governed by Rule 56 of the Federal Rules of Civil Procedure. Rule 56 provides, in pertinent part, that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion." Fed. R. Civ. P. 56(a). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence

of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

The party moving for summary judgment has the initial burden of showing that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 247-48 (1986). Once the moving party has met this initial burden, the nonmoving party has the subsequent burden of presenting evidence to show that a genuine issue of fact remains. The party opposing the motion for summary judgment may not rest upon the mere allegations or denials of her pleading, but must set forth specific facts showing that there is a genuine issue for trial. *Id*. at 248. If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial" then summary judgment is proper as "there can be no 'genuine issue of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)[4]

Moreover, under Rule 56, it is clear that an issue, in order to preclude entry of summary judgment, must be both "material" and "genuine." An issue is "material" if it

---

[4]
       *See also,* Rule 56(e) which provides:

(e)    **Failing to Properly Support or Address a Fact.** If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may:

    (1)       give an opportunity to properly support or address the fact;

    (2)       consider the fact undisputed for purposes of the motion;

    (3)       grant summary judgment if the motion and supporting materials--including the facts considered undisputed--show that the movant is entitled to it; or

    (4)       issue any other appropriate order.

affects the outcome of the litigation. An issue, before it may be considered "genuine,"

must be established by "sufficient evidence supporting the claimed factual dispute . . . to

require a jury or judge to resolve the parties' differing versions of the truth at trial." *Hahn*

*v. Sargent*, 523 F.3d 461, 464 (1st Cir. 1975) (quoting *First Nat'l Bank v. Cities Serv. Co.*

*Inc.*, 391 U.S. 253, 289 (1968)). The Ninth Circuit cases are in accord. *See, e.g., British*

*Motor Car Distrib. V. San Francisco Automotive Indus. Welfare Fund*, 883 F.2d 371 (9th

Cir. 1989).

According to the Ninth Circuit, in order to withstand a motion for summary

judgment, a party

> (1) must make a showing sufficient to establish a genuine issue of
> fact with respect to any element for which it bears the burden of
> proof; (2) must show that there is an issue that may reasonably be
> resolved in favor of either party; and (3) must come forward with
> more persuasive evidence than would otherwise be necessary when
> the factual context makes the non-moving party's claim implausible.

*Id.* at 374 (citation omitted).

Of course, when applying the above standard, the court must view all of the

evidence in the light most favorable to the non-moving party. *Anderson,* 477 U.S. at 255;

*Hughes v. United States*, 953 F.2d 531, 541 (9th Cir. 1992).

The parties stipulate that the summary judgment standard the Court will use will be

that of the court sitting as trier of fact, allowing inference as to facts. *E.g.*, *In re Silver*

*State Helicopters, LLC*, 403 B.R. 849, 853 (Bankr. D. Nev. 2009) ("When the judge is

also ultimate trier of fact, and when trial would not enhance the bankruptcy court's ability

to draw such inferences and conclusions from undisputed facts, then the court is free to

draw such inferences and conclusions within the context of a motion for summary judgment."). (Dkt. 46, 2).

2. **Construction of Idaho Insurance Policies**

When interpreting insurance policies, Idaho courts apply "the general rules of contract law subject to certain special canons of construction." *Arreguin v. Farmers Ins. Co. of Idaho*, 180 P.3d 498, 500 (Idaho 2008) (citing *Clark v. Prudential Prop. & Cas. Ins. Co.*, 66 P.3d 242, 244 (Idaho 2003)). "The general rule is that, because insurance contracts are adhesion contracts, typically not subject to negotiation between the parties, any ambiguity that exists in the contract 'must be construed most strongly against the insurer.'" *Id.* (quoting *Farmers Ins. Co. of Idaho v. Talbot*, 987 P.2d 1043, 1047 (Idaho 1999) (citation omitted). Where a contract's language is clear and unambiguous, its interpretation and legal effect are questions of law. *Bondy v. Levy*, 829 P.2d 1342 (Idaho 1992). If, however, the language in the insurance contract is "reasonably subject to differing interpretations," then it is ambiguous and will be construed strongly against the insurer. *See Clark*, 66 P.3d at 244; *see also Mutual of Enumclaw Ins. Co. v. Roberts*, 912 P.2d 119, 122 (Idaho 1996).

A written contract must be read as a whole and every part interpreted with reference to the whole, with preference given to reasonable interpretations. *See Kennewick,* 880 F.2d at 1032. Contract terms are to be given their ordinary meaning, and when the terms of a contract are clear, the intent of the parties must be ascertained from the contract itself. *See Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.,* 896 F.2d 1542, 1549 (9th Cir.1989). Whenever possible, the plain language of the contract should

be considered first. *See Textron Defense Sys. v. Widnall,* 143 F.3d 1465, 1469 (Fed.Cir.1998); *Leicht v. Bateman Eichler, Hill Richards, Inc.,* 848 F.2d 130, 133 (9th Cir.1988). The fact that the parties dispute a contract's meaning does not establish that the contract is ambiguous; it is only ambiguous if reasonable people could find its terms susceptible to more than one interpretation. *See Kennewick,* 880 F.2d at 1032.

It is up to the Defendant to make sure their policy is clear in its restriction of scope. *See Clark,* 66 P.3d at 245. Whether an insurance policy is ambiguous is a question of law to be answered by the Court. *Arreguin,* 180 P.3d at 500; *see also Armstrong v. Farmers Ins. Co. of Idaho,* 205 P.3d 1203 (Idaho 2009) (citation omitted); *Clark v. St. Paul Property & Liab. Ins. Cos.,* 639 P.2d 454 (1981).

Here, the Court, after reading the contract as a whole and interpreting each relevant provision in reference to the whole, and after considering the plain meaning of the relevant portions of the insurance policy, giving the terms their ordinary meaning, finds that the policy is not ambiguous. Neither party argues that the contract is ambiguous. Rather, each party argues that the relevant provisions unambiguously require resolution of this litigation in their respective favor. Therefore, the Court will decide whether Nonpareil is entitled to additional coverage under the Business Interruption and Future Earnings provisions of the policy.

### 3. **Nonpareil's Business**

In order to resolve the claims in this case, it is important to understand the undisputed facts regarding the potato packing business. Nonpareil purchases or contracts to purchase the potatoes for processing or fresh pack by November or December of each

year.  Some of the purchased potatoes are stored by Nonpareil and some are stored by the parties selling the potatoes with Nonpareil agreeing to take delivery of such potatoes at a later date.  Some potatoes are stored for purposes of playing the open market, some will be packaged for retail sale as market conditions dictate ("fresh pack"), some potatoes are held in storage for processing at a later date such as for french fries, hashbrowns, potato flake and potato flour.  The goal for Nonpariel is to be a net buyer at the end of the processing year (end of July/early August).  The other goal of the company is to have a sufficient raw product supply to maximize its potato packing business throughout the processing year.  The end of the fiscal year for Nonpareil is August 31st as the prior year's potatoes are all processed by this date.

The processing year comes to end in August as potatoes cannot be stored forever. As soon as a potato is harvested, it begins to deteriorate.  As Nonpareil's Director of Procurement, Stephen Abend, testified in his deposition the storage of potatoes is both a science and an art. Certain potatoes, like those from north of Blackfoot, store longer than other potatoes.  Some years the potatoes store for longer periods, some years the potatoes get pressure bruised and have to be processed sooner.  The temperature and moisture in the air when a potato is harvested greatly impacts the time a potato can be stored. Nonpareil maintains a number of storage facilities and the size and venting of a storage facility can impact the potatoes.  The potatoes in storage are inspected regularly to determine if "hot spots" are developing.  If a "hot spot" is noted, the company will try to get those potatoes processed as soon as possible to minimize the number of potatoes that spoil and cannot be processed. Or the company may decide to take the risk of continuing

to hold the potatoes in storage in hope of improved market conditions or the availability of processing facilities.

Potatoes are graded for quality. Some potatoes are process quality and some are retail quality. Nonpareil maintains the process grade potatoes at issue in this case could only be used for processing into potato flake. When the boiler went down in March 2008, potatoes that Nonpareil intended to process into flake could not be processed. Additionally, the status of the potato market in general was an oversupply, therefore, trying to sell its existing inventory to another processor meant potatoes were going to be sold at a loss based on the price those potatoes had been purchased for by contract in the fall of 2007. Hartford does not contest that there was an oversupply of potatoes in the 2008 processing window. Therefore, trying to get out of contracts to purchase potatoes that growing season could only be done at a loss based on market conditions. The Court finds Nonpareil's attempts to sell excess raw potato inventory after the boiler breakdown was a way to mitigate the damages due to the boiler breakdown.

Nonpariel sells fresh pack potatoes and potato flake. Nonpareil can sell more potato flake than it can produce each year. Therefore, sometimes Nonpareil will purchase flake from other suppliers to sell. When the boiler went down in the spring of 2008, this affected the flake production capabilities of Nonpareil. When the new (used) boiler was up an running, Nonpareil ramped up the production as much as possible to use up its inventory of stored potatoes. Flake revenue for May through August of 2008 was higher than previous years. It is unclear from the records how much of the total flake revenue

was from Nonpareil's production and how much was due to flake being purchased by Nonpareil from other sources.

What is perplexing to the Court is why Nonpareil stipulated that all the potatoes at issue "rotted." Dkt. 46, ¶ 7. Clearly, there is no evidence before the Court that the potatoes at issue in the claim for $39,414 rotted in any way. As to the potatoes at issue in the claim for $52,926, the claim is described by Hartford's expert as being for "dry decay split with grower." This seems to imply the potatoes had at least some form of rot or decay associated with the potatoes, yet there is no evidence supplied by Hartford from an inspection of such potatoes to support the dry decay description. As to the final claim for $456,047, this is clearly for dry rot in ending inventory.

### 4. Nonpareil's Claims

#### A. $39, 414 for Raw Potatoes Sold at Loss

The Court finds Nonpareil's claim for $39,414 for raw potatoes sold at a loss falls within the purview of the Business Interruption calculation that provides coverage for lost "Future Earnings." These damages must be directly attributable to the covered loss (boiler breakdown period) and occur after the Period of Restoration. The Court finds the claim arguably does not fit under the "Extra Expense" clause of the business interruption coverage as the loss was not realized until after the Period of Restoration.[5]

---

[5] The Court acknowledges Nonpareil's argument that the loss "occurred" during the Period of Restoration when it could not process potatoes, but was not "realized" until the potatoes were sold after the Period of Restoration. This argument has merit but the Court finds it need not decide the issue of whether the loss is also an "Extra Expense" as it clearly fits the definition for a "Future Earnings" loss.

Nonpareil had three contracts to buy potatoes from others. These purchases totaled $158,824. After the boiler broke, Nonpareil had to sell these potatoes at a loss as it was not going to be able to timely process the potatoes since the boiler was down approximately seven weeks. The total income it received when it resold the potatoes based on the market conditions was $119,410, resulting in a loss of $39,414. The sale of the contracted potatoes was not until after the boiler was back up and running but the inability to process the potatoes was directly attributable to the boiler breakdown – stated another way, but for the boiler breakdown, Nonpareil would have been able to take delivery and process the contracted potatoes.

There is no evidence (other than the stipulation) that selling these potatoes at a loss was related to dry rot. Nonpareil's Chief Financial Officer John Fullmer states in his affidavit "the loss had nothing to do with spoilage." (Aff. of John Fullmer, Dkt. 52, p.5, ¶ 19). This makes sense since Nonpareil was able to sell the potatoes on the open market, albeit at a loss. The Court as the finder of fact for purposes of this motion cannot apply a stipulation that is not supported by any facts establishing that stipulation is true. The difference in contract purchase price and sale price after the boiler breakdown reflected a loss which was a reduction in Business Income as defined by the policy. The contracts for potatoes was a normal business expense and the sale of the potatoes at a loss on the open market was an attempt to mitigate the income loss. Once Nonpareil realized it could not process the raw inventory it already had on site due to the seven weeks of the boiler being shutdown, the decision to sell the contracted potatoes was a reasonable expense to reduce the Business Income loss incurred. Nonpareil lost the opportunity to profit from

the production of these potatoes, yet incurred the expense of the potatoes.  While the mitigation occurred after the Period of Restoration, the expense associated with selling these potatoes at a loss should be considered a reduction to the Business Income due to the boiler shutdown. This claim should be paid by Hartford under the Future Earning clause.

## B. $52,926 for Dry Decay Split with Growers

Nonpareil argues this loss occurred because it could not take possession of these potatoes and had to incur an extra expense by buying out its contracts with KR Farms and Hansen Brothers. It is undisputed that this claim for $52,926 relates to specific raw potato purchase contracts with sellers KR Farms and Hansen Brothers executed in July 2007, six weeks prior to the commencement of the 2007/2008 harvest season.  The contracts provide that the sellers (KR Farms and Hansen Brothers) would store the potatoes until delivery to Nonpareil for processing into potato flake.

The raw potato inventory contracts again appear to be contracts that are entered into in the normal course of Nonpareil's business and but for the boiler shutdown, Nonpareil would have taken delivery and would have had the capacity to process the potatoes into potato flake during the production period.  In order to mitigate damages, Nonpareil issued two checks in September 2008:  $43,157 to KR Farms and $9,769 to Hansen Brothers to settle and satisfy Nonpareil's contractual obligations for the potatoes Nonpareil never took delivery of. The payments did not occur during the Period of

Restoration, but were a business loss of income or a business expense directly attributable to the boiler breakdown.

Again, it unclear to the Court why Nonpareil agreed in the Stipulation, Dkt. 46, to describe this claim as "$52,926 for dry decay split with grower" if such settlement was not related to some form of decay in the potatoes. The Court understands this is the description used by Hartford's forensic accountant on Schedule 5B, but neither side has presented any evidence there was actual decay associated with these contracted potatoes stored by KR Farms and Hansen Brothers. Nonpareil's Chief Financial Officer, John Fullmer's affidavit indicates the loss on these contracts had "nothing to do with spoilage."(Aff. of John Fullmer, Dkt. 52, p.6, ¶ 20). But for the failure of the boiler, Nonpareil would have had the production capacity to process these contracted spuds. Therefore, the Court finds the loss on those contracts is covered either as an Extra Expense (even though suppliers were paid after the Period of Restoration or as a reduction to "Future Earnings" and the claim should be paid in full since there is no evidence these potatoes rotted.

### C. 456,047 for Dry Rot Ending Inventory

Nonpareil claims losses of $456,047 from Dry Rot Ending Inventory in twelve potato storage cellars. Nonpareil maintains that all of this loss was due to the boiler breakdown and not being able to process these potatoes into flake. Nonpareil claims the

dry rot inventory loss was significantly higher than the previous year, when Nonpareil
had a dry rot ending inventory write-off of only $8,200.6

Hartford argues it is undisputed and stipulated that the potatoes rotted and the
policy limit for rotten potatoes has already been paid, so no further payment for dry rot is
covered under the policy.  Hartford also argues it should not have to pay for dry rot that
started prior to the boiler breakdown or was due to improper storage by Nonpareil.
Hartford's expert also opines that actual shipments were greater than projected shipments
for the 2008 season, so no actual business loss was sustained by Nonpareil so these rotten
potatoes in excess of the $50,000 cap cannot be a recoverable expense.7

The problem in this case is that it is impossible for the Court to determine (based
on the record before it) the date the potatoes in each storage unit began to rot, the extent
of the dry rot and how quickly the potatoes rotted in each storage cellar, when the
potatoes were disposed of, how much of the spoilage was due to management or alleged
mismanagement of the storage units, whether the 2007/2008 storage season for harvested
potatoes was substantially shorter or longer than normal, whether there was or was not a
market for the excess raw inventory (when it seems undisputed there was an oversupply
of potatoes during the time of the boiler breakdown and throughout the rest of the 2008

6The Court finds the comparison to one year's dry rot loss is not persuasive when the storage of
potatoes is impacted by numerous factors and does not stay the same from year to year.
7The Court is not persuaded by Hartford's expert regarding the revenue production calculations.
Nonpareil can sell as much potato flake as it can produce and as much as finished product potato
flake that it can buy on the open market.  The fact that total production increased after the boiler
was back up and running does not mean that net income was not impacted by the shutdown.  The
Court finds Nonpareil's expert's opinion is more persuasive.  Because Nonpareil had inventory it
could not process due to the boiler shutdown, it suffered a real loss of Business Income from not
having the capacity to process the raw potato inventory into potato flake and realize a profit on the
potato flake it was unable to produce.

processing season), and whether there were other options for selling the excess raw potato inventory.

Nonpareil urges the Court to assume *all* dry rot was due to the boiler shutdown and should be covered under "Future Earnings." This assumption does not appear reasonable based on the testimony of Mr. Abend wherein he admits that certain storage cellars were experiencing hot spots prior to the boiler breakdown, other factors not related to the boiler shutdown increased the rate of decay in certain cellars, and certain potatoes were for fresh pack, not processing. In fact Nonpareil included in its original claim to Hartford the cost of replacement of destroyed vent pipes, replacement of destroyed doors, excess dirt for seasonal cellar preparation, cellar cleanup and additional labor in total amount of $35,209. (Dkt. 44-19, p. 13). These damages related to cellars do not appear to be related to the boiler shutdown, but may have impacted the rot experienced in certain cellars.

Nonpareil knew it would be filing an insurance claim when the boiler went down in March and the burden is on the insured to provide evidence of claimed losses under the policy. The Court is convinced Nonpareil attempted to mitigate its damages while also trying to continue its business and make up for lost production time once the boiler was back up and running. While the experts disagree about whether lost profits actually occurred based on the purchase of flake to fulfill contracts and the overall production for the season, the Court finds the issue before this Court is were the production expenses associated with rotted potatoes an Extra Expense or a Future Expense under the policy.

The summary referenced by both parties merely says here is the amount of spoiled inventory per storage unit and the average purchase price for the potatoes in that storage unit for year end inventory based on Nonpareil's monthly inventory report for August 2008. (Dkt. 52, p.14 or Dkt. 42-14, p. 25). The summary report is not tied to disposal tickets for all these rotten potatoes.

Failure to maintain adequate disposal records should not be on the insurance company for a claim of this size. Nonpareil did not provide any documentation showing the dates for when it disposed of the potatoes or the weight on disposal ticket sales for cellars 8, 11, 20, 24, 25, 27, 29. (Dkt. 48-1, p. 14). The burden is on the insured to demonstrate that a loss is encompassed by the general coverage provisions of the insurance contract. *See Buckley v. Orem*, 730 P.2d 1037, 1042 (Idaho Ct. App. 1986). Failure to provide this documentation necessitates a finding that Nonpareil failed to meet its burden to show that any losses relating to those cellars would be covered under the policy. Determining damages without such documentation would require speculation by this Court as to the actual amount of damages suffered by Nonpareil for each of these cellars. The Court declines to partake in such speculation. Moreover, the report dates for cellars 8, 25, and 29 were all *prior* to the boiler breakdown and without any disposal tickets after the boiler breakdown in March 2008, there is no evidence to support that the decayed potatoes in these cellars was directly attributable to the boiler breakdown. Therefore, the Court finds Nonpareil is not entitled to damages for losses from potatoes rotting in cellars 8, 11, 20, 24, 25, 27, and 29.

The Court finds Nonpareil has provided disposal tickets for rotten potatoes from the following cellars:

| Cellar | Weight Claimed As Rotten[8] | Weight on Disposal Tickets for Rotten Potatoes[10] | Avg Price of Potatoes Paid in that Cellar[9] | Total Value |
|---|---|---|---|---|
| #3 | 25,006 | 10,677.40 | $5.66 | $60,434.08 |
| #9 | 5,458 | 1,912.80 | $6.00 | $11,476.80 |
| #10 | 3,074 | 4,067.40 | $5.62 | $22,858.79 |
| #14 | 28,264 | 19,869.80 | $4.50 | $89,414.10 |
| #15 | 8,710 | 4,773.40 | $4.60 | $21,957.64 |
| | 70,512 | 41,290.80 | | $206,141.41 |
| Plus the cost of having to haul the rotten potatoes away for disposal | | | | $13,625.95[11] |
| | | | Total for loss based on disposal tickets | $219,767.37 |

The total difference in the weight of claimed rotten potatoes versus the disposal tickets for rotten potatoes for these cellars is 29,221.20 (70,512 - 41,290.80). This creates a large monetary difference in the calculation of the loss by the parties for these cellars even assuming an average potato price of $5.00 per hundred weight. For example, Nonpareil claims the loss from Cellar #3 rotten potatoes is $141,532 using the remaining

[8]Nonpareil's total potatoes in cellar less potatoes taken out and tare resulting in potatoes loss due to rot. Dkt. 42-14, p. 25 and Dkt. 52, p.14.

[9]Gross average price of potatoes in that cellar from Hartford's Accountant, Summary of Spoiled Inventory Loss - As Claimed, Schedule 5C, Dkt. 52, p.14 and Dkt. 42-14, p. 25. Total loss of $456,047.

[10]Nonpareil's Raw Product Loss Scale Tickets, Dkt. 44-19, p. 36, Bates MDD001562.

[11]Nonpareil's cost of spoiled inventory disposal based on disposal ticket total pounds of 41,290.80 times .33. Dkt. 44-19, p. 35, Bates MDD001561.

cellar weight of 25,006 multiplied by the average price of potatoes for Cellar #3. The weight recorded on disposal scale tickets was 10,677.40 lbs for a loss of $60,434.08.

The Court finds Nonpareil was well aware of the date of the boiler breakdown and that it would be filing an insurance claim for the expenses incurred as a result of the boiler breakdown. As discussed earlier, the burden was on Nonpareil to keep adequate business records of the potatoes that could not be processed during the boiler shutdown and rotted. Clearly, the company has the ability to complete disposal tickets and reference the cellar source of the potatoes being disposed of. The Court questions the total weights calculated by Nonpareil since such balances in the cellars are not tied to an equal weight in disposal tickets. If the rotten potatoes were disposed of, there should be disposal tickets with quantity, date and cellar reference for the entire weight or close to the entire weight claimed by Nonpareil. Since such does not exist, the Court will only consider the disposal tickets weights in calculating the loss due to rotten potatoes.

As to Cellar #3, the cellar report dates are March 25, 2008 - May 30, 2008. The scale ticket disposal dates are May 7, 2008 to June 4, 2008. While the disposal did not occur during the Period of Restoration, it is reasonable to assume the disposal was necessary due to the seven week shutdown in March and April. The Court acknowledges the testimony by Mr. Abend that at least some of the rot began before the boiler breakdown and that some of these potatoes may have been for fresh pack. Mr. Fullmer disagrees that any of potatoes in Cellar #3 were for fresh pack, but does not contest that at least some of the rot was noticed prior to the boiler shutdown. The shutdown did prevent Nonpareil from being able to quickly move the hot spot potatoes into production.

Therefore, the Court finds it is fair to allow all the disposal ticketed rotten potatoes disposed of between May and June 2008 to be considered as an extra or future expense under the policy since this is less than half of the potatoes Nonpareil claims rotted in Cellar #3.

The remaining cellars at issue are Storage # 9, 10, 14, and 15. The cellar report dates for Cellar #9 are July 2, 2008 through July 11, 2008, with the scale ticket disposal dates being July 11, 2008 through July 15, 2008. (Dkt. 48-1, 13). The weight recorded on disposal scale tickets is 1,912.80 lbs. *Id*. The cellar report dates for Cellar #10 are July 28, 2008 through August 6, 2008, with the scale ticket disposal dates being July 31, 2008 through August 5, 2008. (Dkt. 48-1, 13). The weight recorded on disposal scale tickets is 4,067.40 lbs. *Id*. The cellar report dates for Cellar #14 are April 16, 2008 through May 15, 2008, with the scale ticket disposal dates being June 4, 2008 through June 10, 2008. (Dkt. 48-1, 14). The weight recorded on disposal scale tickets is 19.869.80 lbs. *Id*. The cellar report dates for Cellar #15 are November 7, 2007 through January 4, 2008 and June 16, 2008 through June 21, 2008, with the scale ticket disposal dates being June 10, 2008 through June 26, 2008. (Dkt. 48-1, 14). The weight recorded on disposal scale tickets is 4,773.40 lbs. *Id*. The Court will include in rotted potatoes the disposal tickets for these cellars.

Because another section of the policy provides coverage for the expense related to the abnormal amount of rotten potatoes for the 2007-2008 production season which were caused by the boiler shutdown, the Court finds the policy limits of $50,000 for rotten potatoes does not limit Hartford's liability under the policy. Therefore, the Court

calculates the loss due to the boiler shutdown for rotten potatoes to be $169,767.37

($219,767.37 less the $50,000 already paid out under the policy for rotten potat

oes) either as an Extra Expense (occurring during the Period of Restoration but not

realized until after the Period of Restoration) or as a reduction to Future Earnings due to

the boiler shutdown.

## CONCLUSION

Nonpareil has carried its burden in establishing that it incurred additional expenses related to potato contracts and rotten potatoes directly attributable to the boiler breakdown which occurred during the period of restoration as Extra Expenses or within the two years provided in the Future Earnings clause. The Court finds Nonpareil is entitled to $39,414 on claim 1, $52,976 on claim 2 and $169,767.37 on claim 3. Total additional recovery under the Extra Expense and/or Future Earnings clauses would be $262,157.37.

## ORDER

**IS HEREBY ORDERED:**

1) Hartford's Motion for Summary Judgment (Dkt. 48) is **GRANTED IN PART AND DENIED IN PART** consistent with this Order. Judgment shall be entered in Plaintiff's favor for the claims decided in this motion in the amount of $262,157.37.

**SO ORDERED.**

DATED:  March 17, 2014

Honorable Edward J. Lodge
U. S. District Judge